RAY W. FARRELL, Plaintiff, *v.* NEW YORK EVENING POST, INC.,
Defendant.

Supreme Court, Trial Term, New York County, April 20, 1938.

*Gibboney, O'Brien & Hayes* [*James V. Hayes* of counsel], for the
plaintiff.

*Guggenheimer & Untermeyer* [*Eugene Untermeyer* of counsel],
for the defendant.

PECORA, J. Upon the close of the testimony in this action for libel the defendant moves for a directed verdict. There is no issue of fact remaining in the case upon which jurors could reasonably differ. Upon the evidence adduced there survives solely an issue of law, the determination of which will be controlling, namely, whether the publication charged to be libelous was absolutely privileged under section 337 of the Civil Practice Act.

The proof shows that on February 13, 1934, the defendant, the owner of a widely-circulated daily newspaper in the city of New York, published an article concerning the dismissal of fourteen employees of the Federal Civil Works Administration (known as the " CWA "). It was stated that their dismissal resulted from charges of padding payrolls and other irregularities in connection with Project No. 18 in Van Cortlandt Park in the city of New York. That is the article complained of, and it is as follows:

" CITY CWA FIRES 14 IN RACKET MOPUP

" Accused of Pay-Roll Padding, Bootlegging and ' Kick-Back ' — Schultz in Policy Game

" BY JAMES K. MARTINDALE

" Fourteen employees of the Civil Works Administration were dismissed today by Acting Administrator De Lamater, who announced that Federal indictments would be sought against some of them.

" The charges on which the dismissals were made included payroll padding, the ' kick-back ' racket, bootlegging and the policy racket.

" Three CWA employees, Colonel De Lamater said, were implicated in a policy racket controlled by ' Dutch ' Schultz, gang leader.

" Two City Workers Accused

" Federal indictments will be sought against ten CWA employees and two city employees whose work was connected with CWA projects.

" Today's dismissals were the first results of an investigation conducted by a special investigation department, composed of representatives of Colonel De Lamater, Commissioner of Accounts Paul Blanchard and special agents of the Department of the Interior, assigned here from Washington.

" The entire investigation is being directed by Louis R. Glavis, director of investigation of the Department of the Interior.

"The Discharged CWA Men

[Then follow the names and addresses of fourteen persons, which, for obvious reasons, will not be set forth in this opinion.]

"Inwood Men Accused

"The two city employees are ————, timekeeper, and ————, custodian of the Municipal Court, Fifth Street, Long Island City.

"The irregularities disclosed today occurred in Manhattan, the Bronx and Queens.

"———— and ————, the construction superintendents, and ————, the pay-roll clerk, were accused by Colonel De Lamater of soliciting money from foremen, supervisors and timekeepers who were working with them in CWA project No. 16, at Inwood Park, Manhattan.

"How much money was involved in this 'kick-back' racket Colonel De Lamater did not disclose.

"Queens job involved

"Pay-roll padding was charged against ————, a laborer, and ———— and ————, the two city employees. They are accused of placing on the payroll of a Queens project the names of men not employed by the CWA and of claiming and cashing the checks.

"The same charge was made against Farrell, ————, ————, ————, ————, and ———— on a project in Van Cortlandt Park.

"Indictments will be sought on charges of defrauding the United States Government, conspiracy to defraud and of receiving and cashing checks drawn on the Treasury for services not performed.

"No Let-Up in Clean-Up

"————, ———— and ———— were dismissed on information furnished by police, who implicated them in the policy games run by Schultz.

"————, a laborer employed at Van Cortlandt Park, was dismissed for bootlegging, Colonel De Lamater said.

"'Other investigations are under way,' the administrator said. 'There will be no let-up in the campaign we have started to clean out every grafter and crook who can be found.'

"None to be Spared

"'The Civil Works Administration of New York City is going to be efficiently and honestly run. No one found guilty of irregularities will be spared.'

"'The vast majority of our more than 150,000 employees are honest and want to do honest work.'

" ' There are still many people in this city who need employment, and those who are dishonest and without appreciation of the opportunity the Government is giving them to earn a decent living can very quickly be replaced.' "

(Note: All matter in brackets is mine. The blank spaces denote names of dismissed employees.)

The plaintiff, who was an assistant technical supervisor, was among those mentioned in the article as having been dismissed.

The evidence discloses that before February 13, 1934, reports were received by Colonel Walter A. De Lamater, acting administrator of the C. W. A. of New York city, of so-called payroll padding upon various projects of the C. W. A. A secret investigation was thereupon begun into that matter and any other irregularities that might be disclosed. The plaintiff was examined therein. Following the investigation the plaintiff and others were dismissed. The facts were presented to the United States District Attorney for the Southern District of New York, who sought an indictment of those implicated. No indictments, however, were actually returned. Before the publication of the article upon which this suit is based, Colonel De Lamater had given the defendant and other newspaper publishers a typewritten press-release containing the information upon which the publication was prepared.

Upon the argument of this motion the plaintiff's attorney conceded, and the facts would justify no other finding, that the press-release issued by Colonel De Lamater was a correct statement of the action taken by his department; and that the article in the defendant's newspaper was a fair paraphrasing of the press-release.

Section 337 of the Civil Practice Act provides in part: " An action, civil or criminal, cannot be maintained against a reporter, editor, publisher, or proprietor of a newspaper, for the publication therein of a fair and true report of any judicial, legislative or other public and official proceedings, or for any heading of the report which is a fair and true headnote of the article published."

Thus, by statute, publication by newspapers of certain matter is absolutely privileged. The first forerunner of this statute (Laws of 1854, chap. 130) permitted proof of actual malice to remove the defense of privilege. Section 1907 of the Code of Civil Procedure continued the statute in substance, and section 337 of the Civil Practice Act, until 1930 (Laws of 1930, chap. 619), made such publications, which were otherwise not actionable, the basis of a valid claim if actual malice in their publication was shown. Thus, motive was the foundation of the action. By the amendment of 1930, however, all publications falling within the purview of the statute are absolutely privileged.

The question here is whether the article complained of was published concerning a "public and official proceeding." In interpreting the scope of this language the court has not been aided by any controlling precedent. The phrase "public and official" has varied meanings depending upon the context in which it is found. "Public" may be used in contradistinction to "private." Again, it may be the antithesis of "secret." The word "public" is defined in the Standard Dictionary as follows: "Of, pertaining to, or affecting the people at large or the community: distinguished from *private* or *personal.*" The same authority defines the word "official" to mean: "Of or pertaining to an office or public trust." The inherent purpose of the statute should point the direction of the interpretation.

The survival of our democracy may ultimately depend upon the enlightenment of its members in matters of legitimate public interest. In their collective judgment our laws and forms of government necessarily must find sanction. Where that judgment is well informed, it is more likely to be sound, and its mandate thereby rendered more effective. To spread that enlightenment is one of the prime functions of the press. In the exercise of that function, the right of the press to report matters of public concern should be free and untrammeled, save only by the obligation to report them fairly and truthfully. This obligation should be scrupulously enforced in order to safeguard one's reputation from defamatory misstatements. Without it, we would be living in a "paradise for gossips," to quote the matchless phrase of a distinquished jurist (Cardozo on The Paradoxes of Legal Science, p. 23).

As in many other instances, the law must draw the line between two meritorious, but conflicting, interests. With the tremendous growth of governmental boards and agencies in recent years, it becomes increasingly important that their actions should not be hidden under the cloak of bureaucratic secrecy where they are dealing with matters of common interest. "The fact that the press is ever ready to publish any irregularities or acts of favoritism has a tendency to keep officials up to the high mark of their calling." (CRANE, J., in *Briarcliff Lodge Hotel* v. *C.-S. Publishers, Inc.,* 260 N. Y. 106, at p. 118.) The desirability of that result doubtless has helped to establish the public policy of our State, which today finds full expression in the principle embodied in section 337 of the Civil Practice Act.

The investigation by Colonel De Lamater was a public and official proceeding. It was action taken by a person officially empowered to do so. Furthermore, the matter upon which action was taken concerned a subject of public, or common, interest. Employees

of a governmental agency were being dismissed after an investigation. The reasons for the dismissal certainly were matters of which the public should be informed. The use of the word " public " in section 337 does not imply publicity in open hearings. It means of general interest or concern.

Consequently, I hold that the article published was as a matter of law absolutely privileged under section 337 of the Civil Practice Act since it was a fair and true report of a public and official proceeding. The defendant's motion for a directed verdict is granted upon that ground.