RICHARD E. SCHERMERHORN, Respondent, v RON ROSENBERG et al., Appellants.

Second Department, March 17, 1980

## APPEARANCES OF COUNSEL

*Becker, Card, Levy & Richards, P. C. (Rodney A. Richards* of counsel; *Bruce O. Becker* on the brief), for appellants.

*Finkelstein, Mauriello, Kaplan & Levine, P. C. (Howard Karger* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

In this action for libel and slander, we are again called upon to strike a balance between the constitutional requirement that freedom of expression be afforded its necessary "breathing space" and the right of a public official to protect his good name against false and defamatory publications. What separates this case from the ordinary, however, is the finding, implicit in the jury's verdict, that the defendants not only published the defamatory matter, they fabricated it. Also presented are questions concerning principles applicable to an action for defamation based solely upon the allegedly libelous headline of an otherwise fair and accurate newspaper article.

Plaintiff Richard E. Schermerhorn is a New York State Senator who, since 1970, has represented what is now the 40th Senatorial District. In March, 1973 he proposed a bill to establish a public benefit development corporation to finance the redevelopment of portions of the City of Newburgh. The corporation, to be known as the Newburgh Development District Corporation, or NDDC, was to issue $50,000,000 in moral obligation bonds to finance the reconstruction.

It soon became evident, however, that the proposal was causing serious concern in Newburgh's black and Hispanic communities which had suffered inordinate disruption and dislocation during earlier attempts at urban renewal in the

city. It was apparently feared that the new bill would not provide adequately for relocation of displaced families and would also result in the dilution of minority voting strength. In an attempt to prevent those consequences, efforts were begun to assure community representation on the board of directors of the proposed NDDC, and those efforts became a subject of inquiry by the defendant *Times Herald Record,* a Middletown newspaper published by the defendant Orange County Division of Ottaway Newspapers, Inc. As a result, the paper assigned several reporters, including defendant Ron Rosenberg, to cover the potential impact of the bill on the minority community.

As part of his investigation, Rosenberg telephoned Senator Schermerhorn at his home to obtain his views as to the composition of the NDDC's board of directors. The Senator willingly discussed his proposal at length with the reporter, and as demonstrated by their trial testimony, both parties have substantially similar recollections of the content of the interview.

Rosenberg informed the Senator that a number of black leaders were insisting that the bill be amended to guarantee black and Hispanic representation on the board of directors. Schermerhorn replied that only the Mayor would have the power to select the board members and that, in any event, any guarantee of appointments based upon race would probably be unconstitutional. The Senator added that it was his hope that those selected would be the best qualified, regardless of color, and would be willing to serve the city without expectation of social, political or economic gain. He especially stressed the need for those with training and experience in financing since that was to be the essence of the NDDC's function. According to Rosenberg, when told of the explicit demands for minority representation, Schermerhorn replied, "I can't help what the Black community wants. I want to be able to have qualified Blacks that can serve. I want to be able to have people who are representative of the community who are, above all, qualified to serve on this Board."[1]

On April 2, 1973 the *Times Herald* carried an article by Rosenberg recounting his interview with Senator Schermerhorn. The headline under which that article appeared read:

---

1. In fact, Senator Schermerhorn testified that he had later recommended that the Mayor appoint to the board of directors a black professor who taught finance at West Point.

"SCHERMERHORN SAYS NDDC CAN DO WITHOUT BLACKS".

The reaction was not long in coming. Local leaders of the black community expressed outrage and immediately sought the assistance of Sidney von Luther and Vander L. Beatty, two State Senators who were viewed as prominent leaders of New York State's black community. On the same day the article appeared officials of Newburgh's chapter of the NAACP traveled to Albany to confer with the Senators and, thereafter, a telephone call was placed to Rosenberg seeking further details of his interview with Senator Schermerhorn. This call would prove crucial to the events that followed.

The next day, April 3, 1973, Senator Schermerhorn became the target of the first resolution in the history of the New York State Senate to call for the censure of a Senator. The resolution, proposed by Senators Beatty and von Luther, accused Schermerhorn of having "made in public certain derogatory statements against the black community" and of having used "his position as a member of the legislature to promote and further his campaign of vilification of members of the black race." The introduction of this resolution was reported in an article appearing in the Times Herald on April 4, 1973, under the headline, "TWO STATE SENATORS CALL FOR SCHERMERHORN'S CENSURE". This article, written by reporter Humphrey Tyler, concluded with the following paragraph relating to statements made by Senator Beatty to the press: "When questioned about his reference to 'racist remarks,' Beatty said that he has access to tapes in which Schermerhorn has made 'subtle anti-black and anti-Semitic' statements, but he refused to reveal who has the tapes. He said they may be turned over to the National Association for the Advancement of Colored People (NAACP) or the American Civil Liberties Union (ACLU) or both."

On April 12, 1973 the Times Herald ran an article concerning the Senate debate on the Schermerhorn NDDC bill. The paper reported that the proceedings were "laced with pointed racial overtones" and that the Times Herald headline, "SCHERMERHORN SAYS NDDC CAN DO WITHOUT BLACKS", had been read three times on the floor of the Senate in the course of the debate.

Meanwhile, Senator Schermerhorn was attempting to defend himself against the accusations. Immediately after the publication of the article of April 2, he informed the editors of the Times Herald that he had never made the remark attrib-

uted to him in the headline and he unsuccessfully demanded a retraction. Following publication of the charge that he had been recorded making racial and ethnic slurs, Senator Schermerhorn tried to assure his colleagues that the accusation was untrue. He agreed that if there were tapes showing otherwise, he would be unfit to serve in the Senate and would resign.[2]

Ultimately, as a result of the controversy, Senator Schermerhorn instituted this action for libel and slander. Significantly, both Senator Beatty and Senator von Luther, who had led the vitriolic campaign against him in the Senate, testified at the trial in his behalf. They explained that their actions had been precipitated both by the April 2 headline and by the telephone conversation they had had with defendant Rosenberg. Both Senators agreed that the reporter had given assurances that Schermerhorn in fact said that the NDDC could do without blacks. According to von Luther, Rosenberg said that Schermerhorn was a "racist bastard" who had told him that Newburgh did not need "niggers" and could also do without Jews and Puerto Ricans. Asked why he had not reported Schermerhorn's use of the word "nigger", Rosenberg replied that he had not wanted to exacerbate feelings and thought that the article was vulgar enough.

Von Luther testified further that during the conversation Rosenberg was very eager to learn the Senators' reaction to Schermerhorn's comments and inquired as to what action they would now take against him. When von Luther suggested that he might move for Schermerhorn's censure and ultimately for his impeachment, Rosenberg volunteered that he had recorded his interview with Schermerhorn and was in possession of a tape of the Senator making racial and ethnic slurs in the course of the conversation. Rosenberg offered the tape to von Luther who accepted the offer believing that the recording would provide the irrefutable evidence needed to support Senator Schermerhorn's ouster.

Senator Beatty's recollection was somewhat less clear. He testified that he was uncertain as to whether Rosenberg or Humphrey Tyler, the other reporter, had first mentioned and offered him the tapes, although he believed it had been Tyler. In any event, Beatty was certain that one of the reporters had assured him of the existence of recordings and it was these to

---

2. Both the censure resolution and the NDDC bill were eventually defeated.

which he had referred in the interview quoted by the paper in its article of April 4, 1973.

Both Rosenberg and Tyler testified at trial, and each denied having been the source of information regarding tapes damaging to Schermerhorn. Rosenberg admitted, however, that after his telephone conversation with Beatty and von Luther he had been left with the distinct impression that they thought he had such tapes. He could offer no explanation as to why the Senators might have formed such a belief. Tyler testified that, upon hearing Beatty mention tapes, he called Rosenberg to ask about them—this although Senator Beatty had never specified who had made the recordings or who was then in possession of them.

In any event, the Senators were never provided with the promised tapes although they made repeated requests for them. Finally, von Luther and Beatty arrived at the conclusion which was later conceded by all sides at trial: No tape recording had been made of Rosenberg's interview with Schermerhorn; there was never any recording of Schermerhorn making racial or ethnic slurs; and Schermerhorn had never made the statement attributed to him in the *Times Herald* headline or the "subtle" remarks as alleged by Senator Beatty.

The case went to the jury on four separate causes of action. The first was based on the headline of the article of April 2, 1973, the second upon Rosenberg's comments in his telephone conversation with Senators Beatty and von Luther, the third upon the article of April 4, 1973, reporting Beatty's charges that he had access to tape recordings of Schermerhorn making racial and ethnic slurs, and the fourth upon the article of April 12, 1973, stating that the earlier *Times Herald* headline had been read three times in the course of the floor debate on the NDDC bill. The jury found for Senator Schermerhorn as against both Rosenberg and the paper on each cause of action and awarded him a total of $36,000 in compensatory and punitive damages. The defendants now appeal.

Senator Schermerhorn contends that the verdicts were consistent with the law and the evidence and must therefore be sustained. The defendants, on the other hand, allege various defects in the proceedings and deficiencies in the proof, but primarily seek to overturn the verdicts as inconsistent with the First Amendment's guarantee of freedom of the press.

Recent history has reaffirmed one of the fundamental pre-

cepts upon which our Republic was founded, namely, that an active, thriving and untrammeled press is an indispensable component of a free and democratic society. Its primary functions include exposing the workings of our government and the conduct of our officials to the cleansing influence of public scrutiny, and providing a fertile and continuing source of supply for the marketplace of ideas from which an intelligent and informed populace may choose its own course. The First Amendment, then, secures a cherished right, one to be protected and nourished.

Yet it is both the genius and the strength of our system that rights, no matter how important, are never absolute; rather, they must be harmonized with the legitimate requirements of other protected rights. This is true as well of the guarantee of a free press (see *Gertz v Robert Welch, Inc.,* 418 US 323, 341-342), which must be reconciled, *inter alia,* with the individual's interest in maintaining his good name, a right which "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *(Rosenblatt v Baer,* 383 US 75, 92, STEWART, J., concurring; see, also, *Williams v Williams,* 23 NY2d 592, 599.)

In the case at bar we are called upon to balance these rights, and we begin by reviewing some principles which are basic to this often difficult area of law. At the outset, we reject the defendants' suggestion that we are bound to search out and apply any possible innocent construction of the words alleged to be defamatory. The law in this State is firmly settled that we are under no such obligation. As the Court of Appeals has said: "It has long been the rule that words charged to be defamatory are to be taken in their natural meaning and that the courts will not strain to interpret them in their mildest and most inoffensive sense to hold them nonlibelous." *(Mencher v Chesley,* 297 NY 94, 99, FULD, J.)

The function of the court in matters such as these is twofold. First, it must determine whether the statement complained of reasonably permits the construction urged by the plaintiff. If it does, then it is for the jury to decide whether that was the sense in which the statement was likely to be understood by the ordinary and average reader. *(Mencher v Chesley, supra,* p 100; *James v Gannett Co.,* 40 NY2d 415, 419; *Rovira v Boget,* 240 NY 314, 316.) Second, the court must determine whether there is a reasonable basis to find that the

meaning ascribed to the statement is actionable. A statement is actionable without allegation or proof of special damage "if it brings a party into hatred, contempt or ridicule by asserting some moral discredit upon his part, [or] if it tends to make him be shunned or avoided, or deprived of the friendly association of a considerable number of respectable members of the community although it imputes no moral turpitude to him." *(Brown v Du Frey,* 1 NY2d 190, 196.) Unless the court can say, as a matter of law, that the statement could not have had such an effect, it is for the jury to decide whether or not it did. (See *Katapodis v Brooklyn Spectator,* 287 NY 17, 21.)

Finally, where, as here, the plaintiff is a public official he must bear the additional burden of demonstrating by proof of convincing clarity that the defamatory matter was published with malice. *(New York Times Co. v Sullivan,* 376 US 254; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, cert den 434 US 969.) The element of malice may be established, *inter alia,* by evidence that the material was published "with knowledge that it was false or with reckless disregard of whether it was false or not" *(New York Times Co. v Sullivan, supra,* p 280), or "with [a] high degree of awareness of [its] probable falsity" *(Garrison v Louisiana,* 379 US 64, 74) or while "the defendant in fact entertained serious doubts as to the truth of his publication." *(St. Amant v Thompson,* 390 US 727, 731.) (See, also, *Pauling v National Review,* 22 NY2d 818, 819; *Trails West v Wolff,* 32 NY2d 207, 219.)

With these principles in mind, we turn to the issues at bar.

■ The first cause of action is based upon the allegedly false headline, "SCHERMERHORN SAYS NDDC CAN DO WITHOUT BLACKS". Senator Schermerhorn maintained that the headline falsely suggested that he had expressed a desire that blacks be excluded from the board of directors of his proposed NDDC. We agree with the trial court that the headline does permit the damaging construction urged by the Senator, and because that construction is one to which the headline is reasonably susceptible, it was properly left for the jury to determine whether that was the sense in which the ordinary reader would understand it.

Moreover, we cannot say as a matter of law that, when so construed, the headline was not actionable. Whether language is defamatory "depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community,

may be highly damaging to reputation at another time or in a different place." *(Mencher v Chesley,* 297 NY 94, 100, *supra.)* It is manifestly clear that, in Newburgh in 1973, a legislator's reputation and standing in the community could be seriously damaged by the suggestion that he believed blacks ought to be excluded from participating in the administration of an important urban renewal project in the city. Moreover, there was evidence that, owing largely to the offending headline, Senator Schermerhorn was shunned and vilified by several of his Senate colleagues, some of whom went so far as to refuse to attend a traditional senatorial dinner simply because he was scheduled to appear. Indeed, there was testimony that as a result of the publication Senator Schermerhorn received a number of threats, his daughter was assaulted and his family required police protection. On this record, therefore, we hold that the issue of whether the headline was defamatory was properly submitted to the jury.

Lastly, on the question of malice, all sides agree that Rosenberg conducted the interview of April 1, 1973, and had actual knowledge that Schermerhorn never made the statement attributed to him in the headline. Rosenberg testified that he had not written the headline, insisting instead that a copy editor named Ira Rifkin was solely responsible for drafting it. On the evidence before us, however, we are of the view that the jury was justified in rejecting that testimony. Rifkin had unaccountably become unavailable and was never produced at trial. More important, the jury heard two State Senators testify that Rosenberg assured them that the headline was accurate and that Schermerhorn had indeed said precisely that the NDDC could do without blacks. The jurors were expressly instructed to return a verdict for Rosenberg if they found that, without any contact with him, an editor had composed the headline. The verdict against Rosenberg carries the implicit finding that, at the least, he had played some part in the formulation of the headline, and we cannot say that that finding is without support in the record.

In our view, then, the evidence was sufficient to sustain the jury's determination that Rosenberg, acting as the agent of the *Times Herald* and within the scope of his employment, had composed a defamatory headline with actual knowledge that the matter asserted therein was false.[3] We therefore

---

3. The *Times Herald* does not argue that it is not responsible for Rosenberg's conduct. Indeed, at trial, it was repeatedly and explicitly conceded that the acts of

sustain the award on the first cause of action. We feel compelled, however, to comment on the instruction given to the jury with respect to the law concerning actions based upon allegedly libelous headlines. The court charged the jury as follows:

"If you find that the headline is merely an interpretation or opinion of what the plaintiff is reported as saying in the body of the article, then you must bring in a verdict for the defendants on that cause of action, unless you also find as a fact that the body of the article contains substantial misstatements of fact.

"The policy of the law is to permit everyone freely to express their *[sic]* opinions on matters of public interest, no matter how erroneous or how injurous *[sic]* those opinions may be to the plaintiff, provided only that the factual basis for that opinion is substantially true.

"If you find that the headline indicates that the plaintiff actually spoke these precise words, or that though it was an opinion, it was based on substantial misstatements of fact in the body of the article, you will then proceed to determine whether the plaintiff has proven the four elements I have previously discussed".

█ This instruction is neither clear nor entirely correct. First, whether a particular statement constitutes fact or opinion is a question of law to be determined by the court. *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 381, *supra.)* Plainly, the headline here purports to state a fact, not an opinion, and the court should have so ruled as a matter of law. This error, however, does not warrant reversal since it actually redounded to the defendants' benefit by permitting the jury to find that the headline represented a protected opinion.

█ Second, the charge lacked a certain clarity as to the proper criteria by which the jury was to evaluate the allegedly libelous character of the headline. The rule in this State is that "[d]efamatory head lines are actionable though the matter following is not, unless they fairly indicate the substance of the matter to which they refer, and * * * unless they are a fair index of the matter contained in a truthful report." *(Lawyers' Co-op Pub. Co. v West Pub. Co.,* 32 App Div 585,

Rosenberg should be imputed to the paper. (Cf. *James v Gannett Co.,* 40 NY2d 415, 424; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 382-383, cert den 434 US 969.)

590; see, also, *Campbell v New York Evening Post,* 245 NY 320, 328.) To determine whether the headline is a fair index of the article with which it appears, both must be considered together. *(Bresslin v Sun Print. & Pub. Assn.,* 177 App Div 92, 94; *Cole Fisher Rogow, Inc. v Carl Ally, Inc.,* 29 AD2d 423, 426, affd 25 NY2d 943.) If the headline is a fair index of an accurate article, it is not actionable. If it is not a fair index, then the headline must be examined independently to determine whether it is actionable under general principles of libel. That the defamatory meaning of the headline may be dispelled by a reading of the entire article is of no avail to the publisher. A headline is often all that is read by the casual reader and therefore separately carries a potential for injury as great as any other false publication. (See *Shubert v Variety, Inc.,* 128 Misc 428, 430, affd 221 App Div 856; cf. *Gambuzza v Time, Inc.,* 18 AD2d 351, 353-354.)

In our opinion, although the court failed to instruct the jury fully on these principles, the charge taken in its entirety was adequate and does not warrant reversal. Senator Schermerhorn never contended that the body of the April 2 article contained "substantial misstatements of fact." Hence, there was never any issue regarding the accuracy of the article itself. That being so, the first paragraph of the quoted portion of the charge must be read as having directed the jurors to return a verdict for the defendants if they found that "the headline was merely an interpretation * * * of what the plaintiff was reported [to have said] in the body of the article". This instruction adequately informed the jury that the defendants were entitled to a verdict on the first cause of action if the headline was a fair index of the concededly accurate article. Nothing more was required. Indeed, to the extent that the court's charge differed from the fair index rule, it was more favorable to the defendants since it would permit them to prevail even if the jury did not find that the interpretation of the article was "fair". Accordingly, although the charge with respect to the first cause of action could well have been more exact, it does not require reversal.

■ The second cause of action was based upon Rosenberg's telephone conversation with Senators von Luther and Beatty, and specifically upon his statement that Schermerhorn had in fact made the remark attributed to him in the headline. For the reasons previously discussed, we hold that the evidence at trial was sufficient to sustain the jury's determination that

Rosenberg made the statement, that it was defamatory, and that it was made with actual knowledge that it was untrue. Accordingly, the verdict on the second cause of action, returned after proper jury instructions, must be upheld.

The award on the third cause of action is the most unusual for it rests upon an article which all sides agree is fully accurate. There is no dispute that Senator Beatty did say, as reported in the *Times Herald* article of April 4, 1973, that he had access to tapes of Senator Schermerhorn making "subtle anti-black and anti-Semitic" remarks. Hence, regardless of whether the substance of the charge was true, the report of the accusation was accurate.

█ Although the concept is not universally accepted, it has been said that because an accusation leveled at a public figure is itself newsworthy, it may be freely reported by a newspaper regardless of the belief of the reporter as to the truth of the charge itself. This is sometimes referred to as the right of "neutral reportage." (See *Edwards v National Audubon Soc.,* 556 F2d 113, cert den 434 US 1002; *Orr v Lynch,* 60 AD2d 949, affd 45 NY2d 903; cf. *Dickey v CBS, Inc.,* 583 F2d 1221, 1225-1226.) We think, however, that even those courts which adhere to the doctrine of neutral reportage would nevertheless reject the notion that it should apply where the substance of the accusation was concocted and disseminated by the reporter himself. A newspaper simply may not shield itself from a libel action by reporting the utterance of a false and defamatory accusation of which it was the source. To hold otherwise would be to denigrate rather than to advance the values encompassed within and protected by the First Amendment.

The public looks to the press not only as a forum for divergent ideas and opinions but, equally important, as a source of accurate accounts of newsworthy events. Permitting the press intentionally to disseminate false and defamatory reports with impunity would be to damage its credibility and ultimately to injure the press as an institution. And although we adhere without reservation to the principle that the First Amendment will brook no prior restraints even of reports alleged to be false, we note that those cases which so hold acknowledge the right to redress following publication. (See *Goldblum v National Broadcasting Corp.,* 584 F2d 904; cf. *Southeastern Promotions v Conrad,* 420 US 546, 558-559.) As the United States Supreme Court has said: "Calculated false-

hood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality . . .' *Chaplinsky v. New Hampshire,* 315 U. S. 568, 572." *(Garrison v Louisiana,* 379 US 64, 75, *supra.)*

We therefore decline to read the First Amendment as leaving remediless those injured when a newspaper chooses to intentionally defame or to assassinate character with wanton disregard for the truth.

The record in this case is clear that there never were tapes of Senator Schermerhorn uttering "anti-black" or "anti-Semitic" remarks, and that Rosenberg knew that. Yet Senator von Luther testified unequivocally that Rosenberg had represented that such recordings existed and, considering the record as a whole, we conclude that the jury was entitled to credit the Senator's testimony as against Rosenberg's denial.[4]

Accordingly, we hold that the publication of Senator Beatty's defamatory charge, itself fabricated by the defendants and known by them to be false, supports the libel award on the third cause of action.

■ The fourth cause of action presents an added dimension to the balancing of rights in this case. That award was based upon the publication of the fact that the earlier defamatory headline had been read three times in the course of the floor debate on Senator Schermerhorn's bill. For the reasons previously stated, the jury was entitled to find that the headline was defamatory, that it was reprinted by the defendants with knowledge that it was false, and that the defendants were not shielded by the fact that the article complained of was a fair and accurate account of what other people said. Nevertheless, under the circumstances at bar, we hold that the publication was protected by a principle of overriding importance embodied in New York statutory law as an expression of this State's public policy.

Section 74 of the Civil Rights Law provides, in pertinent part: "A civil action cannot be maintained against any person,

---

4. Again it should be noted that the *Times Herald* does not seek to disavow responsibility for Rosenberg's conduct. Indeed, it is clear that his acts, as found by the jury, were calculated to evoke a response from the Senators and thus to produce additional news items on a matter of substantial public interest. They were therefore within the scope of his employment as a *Times Herald* reporter.

firm or corporation, for the publication of a fair and true report of any * * * legislative proceeding".

In recognition of the paramount interest of the public in being informed of the actions of its Legislature, the statute affords an absolute privilege to fair and accurate accounts of legislative proceedings. (Cf. *Holy Spirit Assn. for Unification of World Christianity v New York Times Co.,* 49 NY2d 63.)

There is no dispute that the *Times Herald* article of April 12, 1973 accurately reported the proceedings of the Legislature on the NDDC bill. That being so, the public's right to know must outweigh the individual rights of the plaintiff, with the result that the article was absolutely privileged. Accordingly, the verdict on the fourth cause of action must be set aside and that cause dismissed.

We have considered the other contentions raised by the defendants and find them to be without merit.

In sum, the judgment appealed from is modified. The awards on the first, second and third causes of action are affirmed. The award on the fourth cause of action is set aside and that cause is dismissed.

HOPKINS, DAMIANI, TITONE and MANGANO, JJ., concur.

Judgment of the Supreme Court, Orange County, entered June 30, 1978, modified, on the law, by deleting therefrom the amount attributable to the recovery on the fourth cause of action and adding thereto a provision dismissing that cause of action. As so modified, judgment affirmed, with costs to plaintiff, and action remitted to Trial Term for entry of an appropriate amended judgment.