MICHAEL A. GURDA, Appellant-Respondent, v ORANGE COUNTY PUBLICATIONS DIVISION OF OTTAWAY NEWSPAPERS, INC., et al., Respondents, and HOWARD KARGER, Respondent-Appellant.

MICHAEL A. GURDA, JR., Appellant-Respondent, v ORANGE COUNTY PUBLICATIONS DIVISION OF OTTAWAY NEWSPAPERS, INC., et al., Respondents, and HOWARD KARGER, Respondent-Appellant.

Second Department, June 8, 1981

**APPEARANCES OF COUNSEL**

*John S. McBride* for Michael A. Gurda, appellant-respondent. *Gerald Orseck (Robert N. Isseks* of counsel), for Michael A. Gurda, Jr., appellant-respondent.

*Becker, Card, Levy & Richards*, P. C. *(Rodney A. Richards* of counsel), for Orange County Publications Division of Ottaway Newspapers, Inc., respondents.

*Howard Karger (Sheila Callahan* of counsel), respondent-appellant *pro se.*

OPINION OF THE COURT

WEINSTEIN, J.

The instant litigation has its genesis in two judgments obtained by the Aetna Casualty and Surety Company against, respectively, the Hambly Construction Company, Inc., in 1970 and William J. Hambly in 1972, in connection with a default by Hambly Construction and Hambly on a contract with New York State to build dormitories at a State college. Aetna subsequently brought an action against, *inter alia*, Hambly's attorney and the attorney's son, Michael A. Gurda and Michael A. Gurda, Jr., who are the plaintiffs herein, seeking to set aside certain conveyances of real property alleged to have been made by Hambly to the Gurdas for the purpose of hindering Aetna's attempts to satisfy the afore-mentioned judgments. The court, after a nonjury trial, found in favor of Aetna on certain causes of action in that certain of the conveyances were made with actual intent to hinder or delay present creditors, and therefore were fraudulent within the meaning of section 276 of the Debtor and Creditor Law. Pursuant to section 276-a of that law, Aetna was also awarded attorneys' fees.

Defendant Orange County Publications thereafter published, in a newspaper known as the *Times Herald Record*, an article describing the latter lawsuit. A headline appearing prominently on the first page of the newspaper's edition of April 21, 1979, proclaimed "Judge: Gurdas, builder defrauded firm." A caption over the article itself on page 3 read "Gurdas, builder fined in fraud case." In the body of the article was a statement that the Gurdas and Hambly "defrauded" Aetna, and a quotation attributed to defendant Howard Karger, attorney for Aetna, that the Gurdas "were guilty of intentional fraud at a time he [*sic*] was an attorney of law admitted to practice in the State of New York". The Gurdas thereupon each brought an action against Orange County Publications and the *Times Herald Record* (both hereinafter referred to as the newspaper) and against Karger to recover damages for libel.

The newspaper moved for summary judgment dismissing the complaints as to them on the ground that the published article was "a fair and true report of any judicial proceeding" within the meaning of the absolute privilege set forth in section 74 of the Civil Rights Law. The court granted the motion. It reasoned that although the fraud defined in the Debtor and Creditor Law was not equivalent to the type of fraud that the average layman associates with the term (that is to say, criminal intent to defraud), the article's failure to draw this distinction did not render it not "fair and true" so as to deprive the newspaper of the protection afforded by the Civil Rights Law. The court also held that the attorneys' fees award against the Gurdas could reasonably be described, by a lay reporter, as a fine, even though it was not a fine in the strict legal sense. The court reached a similar conclusion with respect to Karger, and granted his motion for summary judgment dismissing the complaints as to him.

This court is now called upon to review Special Term's decision dismissing the complaints. We turn to so much of the judgments as granted summary judgment in favor of the newspaper.

The question is, of course, whether the article can be said, as a matter of law, to be a "fair and true report of [a] judicial proceeding," or whether this issue should be left to a jury for determination. We are mindful of the public policy, reflected in section 74 of the Civil Rights Law, of encouraging public scrutiny of judicial proceedings, thereby enhancing the integrity of the courts and reinforcing the accountability of those that administer justice (see *Shiles v News Syndicate Co.*, 27 NY2d 9; *Williams v Williams*, 23 NY2d 592). However, such scrutiny safeguards neither integrity nor accountability when it is applied carelessly (see *Williams v Williams, supra*). In such cases, the harm to persons defamed outweighs the benefits to be gained from public scrutiny of the courts. Therefore, the privilege set forth in section 74 of the Civil Rights Law is absolute, irrespective of the presence or ab-

sence of malice or bad faith,* but only when the report is "fair and true".

The Legislature, mindful of the possibility of abuse, has seen fit to demand a corresponding duty from those who scrutinize the courts, that their reports indeed be fair and true. This duty is not necessarily to ensure that reports of judicial proceedings be rigidly and technically perfect (see *Briarcliff Lodge Hotel v Citizen-Sentinel Publishers*, 260 NY 106; *Keogh v New York Herald Tribune*, 51 Misc 2d 888, affd 28 AD2d 1209, mot for lv to app den 21 NY2d 955; *George v Time, Inc.*, 259 App Div 324, affd 287 NY 742). Neither will the omission of mere details in an otherwise accurate account render the report libelous (see *Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, cert den 434 US 969). But there is a fine line between reports of judicial proceedings which are generally true and fair, and hence absolutely privileged, and reports which a trier of fact could find to be meaningfully false and unfair, and therefore not privileged. The newspaper article involved here has crossed that fine line.

It is well settled that in actions to recover damages for defamation, whether or not based on a report of judicial proceedings, words are to be construed as persons generally understand them and according to their ordinary meaning (see *Cafferty v Southern Tier Pub. Co.*, 226 NY 87; *Rovira v Boget*, 240 NY 314). Courts should not strain to interpret words so as to render them inoffensive and hence nonlibelous (see *Mencher v Chesley*, 297 NY 94; *Schermerhorn v Rosenberg*, 73 AD2d 276). Moreover, if the headlines of an article are susceptible of a libelous interpretation, a libel action should not be dismissed even though the body of the article may be inoffensive (see *Campbell v New York Evening Post*, 245 NY 320; *Shubert v Variety, Inc.*, 128 Misc 428, affd 221 App Div 856).

Applying these general principles to the case at bar, we hold that a jury could find that the ordinary meaning of

---

* To be sure, an action for libel based on a fair and true report of a judicial proceeding could at one time be maintained if actual malice were shown (former Civ Prac Act, § 337 [L 1920, ch 925]). The actual malice exception was deleted in 1930 (L 1930, ch 619).

the words in the article or its headlines rendered them false and unfair in a meaningful way, and hence, libelous. Special Term properly observed that the terms "fraud" and "defraud" can connote criminal activity (cf. Penal Law, arts 185, 190). However, it erred in holding that the article's failure to differentiate between civil and criminal fraud, a distinction too subtle to be known to most layman readers of the article, was of no legal consequence. Since a jury could well find that the ordinary meaning of the words "fraud" and "defraud" is the criminal one, in which case the article would no longer be a fair and true report of a judicial proceeding, a trial must be held to determine this issue. We think it is particularly noteworthy that the headline regarding the fraud was prominently emblazoned across the masthead. It is possible, therefore, that even if a reader, upon reading the entire article, would have been able to discern that there was no question of criminal fraud involved, he might very well notice the headline and then not proceed to read the explanation in the body of the article.

We also note the use of the word "fined" in the caption of the article. The word "fine" has been defined as a monetary punishment imposed upon a person or other entity "convicted of [a] crime or misdemeanor" (see *American Sur. Co. of N.Y. v Town of Islip*, 268 App Div 92, 96; see, also, Penal Law, art 80). While this certainly is not the only reasonable meaning that could be attached to the word, we are satisfied that an issue of fact exists as to whether the use of the word "fined" in the caption was libelous.

Furthermore, the use of the phrase "guilty of intentional fraud" in the body of the article, perhaps the words most susceptible to a libelous interpretation, surely could be interpreted by a lay jury or reader to mean that criminal activity was afoot. In an instance, such as this one, where such an interpretation is manifestly so reasonable, it is incorrect to deem the article a fair and true report of a judicial proceeding as a matter of law. The article could reasonably be read in a way that would render it untrue; therefore, it was error to grant summary judgment in favor of the newspaper. Accordingly, this matter must be re-

manded for a trial of the Gurdas' causes of action against the newspaper.

We recognize, as the dissenters emphasize, that the word "fraud" can call to mind concepts, such as "trickery", "deceit", or "misrepresentation", which are free of criminal connotation. And we assure the dissenters that we do not consider those individuals who have paid a fine for misjudging the time remaining on a parking meter or for returning an overdue book to a public library to be criminals. But we are not granting summary judgment in favor of the plaintiffs on their causes of action for libel. To do so would most assuredly be entirely erroneous. Our holding merely directs a jury to be impaneled to decide the issues of fact. The words "fraud" and "fine" may not connote criminal activity to the reasonable person, but then again, they may. If they do, then the newspaper article is by no means a fair, and definitely not a true, report. Questions of fact exist, and our holding today means nothing more and nothing less than that the usual judicial methods for resolving them must be employed.

We do not intend, by our holding today, to cut back on the First Amendment guarantees of free press and free speech which are so deeply engrained in our constitutional and social heritage. We reaffirm the principle, by which the jury that will try these actions should be guided, that in order to be afforded the protection of section 74 of the Civil Rights Law, a report of a judicial proceeding need not be a verbatim report, absolutely true and correct in all respects. A "fair and true report", not a rigidly and technically perfect one, is all that is required (see *Briarcliff Lodge Hotel v Citizen-Sentinel Publishers, supra; George v Time, Inc., supra; Holy Spirit Assn. for Unification of World Christianity v New York Times Co.,* 49 NY2d 63; *Grobe v Three Vil. Herald,* 69 AD2d 175, affd 49 NY2d 932). Omission of minor details in an otherwise accurate account is not actionable (see *Rinaldi v Holt, Rinehart, & Winston,* 42 NY2d 369, cert den 434 US 969, *supra).* But the faults of the newspaper article in question were neither minor nor omissions. They were several prominently printed words and phrases which might very well imply to layman readers

that the Gurdas had committed a criminal offense. We cannot say that, as a matter of law, the article was a fair and true report of the lawsuit. A trier of fact must determine whether the fair import of the article was libelous or whether it was, indeed, viewed in its entirety, a fair and true report of a judicial proceeding (see *Mencher v Chesley*, 297 NY 94, *supra; Colpitts v Fine*, 42 AD2d 551).

We may now turn our attention to the two remaining issues before us. We affirm the judgments under review insofar as they granted summary judgment in favor of Howard Karger. His statement to the author of the article was a mere opinion of what had transpired, and hence, was protected under the rule of *Rinaldi v Holt, Rinehart & Winston (supra)*.

Finally, we note that Special Term properly declined to award discretionary costs to Karger pursuant to CPLR 8303 (subd [a], par 2).

MOLLEN, P. J., and TITONE, J. (concurring in part and dissenting in part). In our view, the plaintiffs' actions against the *Times Herald Record* and its publisher are inconsistent with the guarantees of the First Amendment and with the letter and spirit of section 74 of the Civil Rights Law. Accordingly, we respectfully dissent from so much of the majority's holding as would deny the newspaper's motion for summary judgment. Briefly stated, the facts pertinent to the issue are these:

In 1965 William J. Hambly was in the construction business. In or about May of that year, his firm, Hambly Construction Company, Inc., entered into a contract with the State of New York to build certain dormitories at a branch of the State University at Delhi, New York. In order to obtain the contract, the company was required to secure a performance bond, and, to that end, Hambly entered into an agreement with the Aetna Casualty and Surety Company. Aetna agreed to issue the bond and, in return, Hambly agreed personally to indemnify Aetna for any loss sustained on account of a default by his construction company in the completion of the dormitories. Subsequently, the company did in fact default on the job and Aetna was called upon to complete the construction. Aetna

thereupon brought suit, *inter alia*, against the company and Hambly personally, as guarantor, for losses sustained upon the performance bond. In June, 1970, Aetna obtained a default judgment against the company in the amount of $124,425.54. Two years later, a judgment in Aetna's favor was entered against Hambly personally in the sum of $277,808.51 (later reduced to $147,593.47, plus interest). Hambly was represented in the action by attorney Michael A. Gurda.

When the judgments were returned unsatisfied, Aetna instituted an action seeking to set aside certain conveyances of real property made by Hambly. Aetna alleged that those conveyances were fraudulent because they were knowingly made with actual intent to hinder, delay or defraud present or future creditors. Specifically, and as relevant here, Aetna complained of a transfer, made on November 2, 1970, when Hambly conveyed all his interest in certain properties to his attorney Michael A. Gurda and to Gurda's son, Michael A. Gurda, Jr. Both Gurdas were therefore named as defendants in the action.

On April 19, 1979, following a nonjury trial, the court issued a memorandum decision finding that Aetna was entitled to judgment on the first and fifth causes of action of each of its two amended complaints which had been consolidated for trial and which involved different parcels of property. The claims found to have been established in each instance were essentially that (1) with knowledge that Hambly had incurred debts to Aetna, the Gurdas agreed that Hambly would convey his interest in certain property to them so as to hinder, delay or defraud Aetna in the collection of moneys to which it was due or was to become due; and (2) the Gurdas accepted the conveyance from Hambly with knowledge and with intent to hinder, delay or defraud Aetna in the collection of the said moneys. The court also found that, in addition to a money judgment, Aetna was entitled to recover attorneys' fees pursuant to section 276-a of the Debtor and Creditor Law.

In its decision, the court found that the evidence adduced at trial established "an actual intent to hinder or delay [Aetna] in satisfying any judgment which [Aetna] might

recover against * * * Hambly." The court noted additionally that "[w]hether or not [Aetna] proved an actual intent on the part of * * * Hambly to defraud [Aetna] is not determinative of this case. Actual intent to hinder or delay was proved and that is sufficient to satisfy the language of [section 276 of the Debtor and Creditor Law]."

The dispute now before this court arose out of the publication of an article about the case in the *Times Herald Record*, a Middletown newspaper published by Orange County Publications, a division of Ottaway Newspapers, Inc. Above the masthead of its April 21, 1979 edition, the paper ran a headline which read:

"Judge: Gurdas, builder defrauded firm"
The headline, which appeared with others on the front page, referred the reader to page 3 of the paper. On that page an article regarding the case appeared under the headline:

"Gurdas, builder fined in fraud case"

The article read in pertinent part as follows:

"An acting state Supreme Court justice has found that Middletown attorneys Michael A. Gurda, Sr., his son, Michael Jr., and a former local contractor defrauded an insurance company through the 1970 sale of land along Dolson Avenue in Middletown * * *

"[The justice] found the Gurdas and contractor William J. Hambly defrauded the Aetna Casualty and Surety Co., when the contractor sold his half-interest in the 26-acre parcel to the attorneys in November 1970. If the ruling withstands an expected appeal, it would force the Gurdas and Hambly to pay $185,000 and legal fees, which have not yet been determined.

"The defendants in the case are not required to pay the penalty until the appeal process is exhausted * * *

" 'Based on a review of the decision, [the Judge] found that Mr. Gurda and his son were guilty of intentional fraud at a time he [*sic*] was an attorney of law admitted to practice in the State of New York' said Howard Karger of the Newburgh law firm * * * representing Aetna".

The article went on to trace the somewhat complex history

of the litigation and liberally quoted from the court's decision.

Following the publication of the article, the Gurdas each instituted a defamation action against the *Times Herald Record*, its publisher, and attorney Howard Karger. The Gurdas' complaints were essentially identical, each asserting the same three causes of action. The first, against the paper, was predicated upon the front-page headline, "Judge: Gurdas, builder defrauded firm"; the second, also against the corporate defendants, was based upon the inside headline and the portion of the article quoted above, with the exception of the two sentences concerning the amount of the "penalty" assessed and when that "penalty" would have to be paid; the third cause of action was against Karger for the comment attributed to him by the newspaper. Special Term granted the defendants' motions for summary judgment and dismissed the complaints. The entire court agrees that, because Karger's remark constituted a protected expression of opinion, the causes of action against him were properly dismissed. However, the majority reverses Special Term's judgments insofar as they dismissed the causes of action in each complaint directed against the newspaper and its publisher. The majority holds that there are triable issues of fact regarding whether the Gurdas were libeled by the newspaper report. It is with this conclusion that we disagree.

The plaintiffs' case against the corporate defendants rests entirely upon the use of three words in the headlines and body of the article. Those words are "defrauded", "fraud", and "fine". As to the first two, the majority would deny summary judgment to the paper because (1) "in actions * * * for defamation * * * words are to be construed as persons generally understand them and according to their ordinary meaning", (2) "the terms 'fraud' and 'defraud' can connote criminal activity", and (3) "a jury could well find that the ordinary meaning of the terms 'fraud' and 'defraud' is the criminal one". The court makes a similar finding with respect to the word "fine," noting that that term "has been defined as monetary punishment imposed upon a person or other entity 'convicted of [a] crime or misdemeanor' ".

It is true that the words, "fraud" and "defraud" do appear in some of our criminal statutes (see, e.g., Penal Law, art 185). Yet dictionary definitions speak of "trickery" or "deceit" especially involving "misrepresentation," and not of criminal acts. (See, e.g., Webster's Third New International Dictionary.) Similarly, it is certainly true that fines are sometimes imposed as a consequence of a criminal conviction. (See Penal Law, art 80.) But the suggestion that the term has exclusive or even primary reference to criminal conduct would undoubtedly come as an unpleasant surprise to those who have misjudged the time remaining on a parking meter or who have been late in returning a book to a public library. However, it is not merely the ambiguity of these words that leads us to conclude that they will not support the libel actions at bar. Instead, it is the context and subject matter of the article in which they appear, measured in light of the constitutional and statutory protections afforded to the press, that persuades us that these complaints must be dismissed.

Whenever a libel action is brought against a newspaper, the courts are called upon to strike a balance between the individual's right to protect his good name and the guarantees of the First Amendment which safeguard the people's right to an active, thriving and untrammeled press, an indispensable component of any free and democratic society. (See, e.g., *Schermerhorn v Rosenberg*, 73 AD2d 276, 283.) As the majority correctly observes, in resolving these cases "[i]t has long been the rule that words charged to be defamatory are to be taken in their natural meaning and that the courts will not strain to interpret them in their mildest and most inoffensive sense to hold them nonlibelous." *(Mencher v Chesley*, 297 NY 94, 99, FULD, J.) Yet, by the same token, it has been said that "[w]hen the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *(Cafferty v Southern Tier Pub. Co.*, 226 NY 87, 93; see, also, *George v Time, Inc.*, 259 App Div 324, 328-329, affd 287 NY 742.) This latter principle seems most applicable to the circumstances at bar.

Among the most significant functions served by the First Amendment is to protect the right of free access to information concerning the workings of our public institutions. In recognition of the importance of this purpose, this State has fortified the guarantees of the First Amendment by enacting statutes which afford absolute immunity from libel actions to certain reports of public proceedings. (See, e.g., *Farrell v New York Evening Post,* 167 Misc 412, 416.) The statute now performing that function is section 74 of the Civil Rights Law, which provides in pertinent part: "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."

The purpose of providing immunity to fair and true reports of judicial proceedings is said to be to encourage the dissemination of information concerning the judicial branch of government and thereby to serve the public interest "in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice." *(Lee v Brooklyn Union Pub. Co.,* 209 NY 245, 248; see, also, *Shiles v News Syndicate Co.,* 27 NY2d 9, 14.) In examining the scope of protection afforded by section 74 of the Civil Rights Law, our Court of Appeals has observed: "For a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate. As stated by this court in *Briarcliff Lodge Hotel v Citizen-Sentinel Publishers* (260 NY 106, 118): '[A] fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated.' (See, also, *Keogh v New York Herald Tribune,* 51 Misc 2d 888, 894, affd 28 AD2d 1209, mot for lv app den 21 NY2d 955; *George v Time, Inc.,* 259 App Div 324, 328-329, affd 287 NY 742; *Hanft v Heller,* 64 Misc 2d 947; *Edmiston v Time, Inc.,* 257 F Supp 22, 24-26.)" *(Holy Spirit Assn. for Unification of World Christianity v New York Times Co.,* 49 NY2d 63, 67.) It is

from this perspective that we must examine the contentions at bar.

The Gurdas complain that they were defamed by the headlines and article which stated that they had been found to have "defrauded" Aetna and they had been "fined" in a "fraud" case. Regardless of the specific factual findings rendered, the fact remains that the court unequivocally held that the Gurdas had violated section 276 of the Debtor and Creditor Law. That section provides: "276. Conveyance made *with intent to defraud.* Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, *is fraudulent* as to both present and future creditors." (Emphasis supplied.)

In light of this statutory language, we cannot agree with the majority that the corporate defendants may be found liable for defamation for using the words "fraud" and "defrauded," for we conclude as a matter of law that, in reporting judicial proceedings, a newspaper may not be held to a stricter standard in the correct use of technical and legal terms than is the Legislature which drafted the statutes themselves. Plainly, a newspaper must be afforded immunity under section 74 of the Civil Rights Law when it reports on judicial proceedings using the very language of the statutes at issue in those proceedings.

Moreover, as to the word "fine," although it is clear that no fine, as such, was imposed, the court did rule that, in addition to a money judgment, Aetna was entitled to attorneys' fees pursuant to section 276-a of the Debtor and Creditor Law. The award of attorneys' fees in this case was, in actuality, not entirely unlike the imposition of a fine since it was permissible only upon a finding that the Gurdas had been party to a "fraudulent" transfer within the meaning of the statute. (See Debtor and Creditor Law, § 276-a.) Clearly, the award of counsel fees could well have been seen as a penalty or "fine" by one untutored in the law. And, in determining whether the paper's use of the word was unreasonable, we are guided by the observation of the Court of Appeals in *Holy Spirit Assn. for Unification of World*

*Christianity v New York Times Co.* (49 NY2d 63, 68, *supra)*: "[N]ewspaper accounts of legislative or other official proceedings must be accorded some degree of liberality. When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used."

Freedom of expression must have breathing space to survive (cf. *National Assn. for Advancement of Colored People v Button,* 371 US 415, 433). Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of the First Amendment and statutes like section 74 of the Civil Rights Law, and the public's right to know would be seriously threatened. (See *Grobe v Three Vil. Herald,* 69 AD2d 175, affd 49 NY2d 932.) Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression. (See *Hotchner v Castillo-Puche,* 551 F2d 910, 913, cert den *sub nom. Hotchner v Doubleday & Co.,* 434 US 834.) Compelling the corporate defendants here to stand plenary trial for libel would, in our view, do violence to these fundamental principles. We therefore conclude that all the defendants were entitled to summary judgment dismissing the complaints and, accordingly, we would affirm the judgments appealed from in all respects.

HOPKINS and LAZER, JJ., concur with WEINSTEIN, J.; MOLLEN, P. J., and TITONE, J., concur in part and dissent in part, in an opinion.

Two judgments of the Supreme Court, Orange County, both dated September 17, 1979, modified, by deleting there-

from the provisions granting summary judgment to all the defendants and substituting therefor provisions granting summary judgment only to defendant Howard Karger. As so modified, judgments affirmed, without costs or disbursements, and the complaints are reinstated as to the corporate defendants.