ROBERT A. BECHER, Respondent, v TROY PUBLISHING COMPANY, INC., Appellant.

Third Department, November 5, 1992

### APPEARANCES OF COUNSEL

*O'Connell & Aronowitz,* Albany *(Peter Danziger* and *Barbara G. Billet* of counsel), for appellant.

*Frost & Donohue,* Troy *(Brian Donohue* of counsel), for respondent.

### OPINION OF THE COURT

LEVINE, J.

This libel action arose out of the reportage, in defendant's newspaper, of judicial proceedings concerning an indictment

handed up by an extended Rensselaer County Grand Jury in October 1987 involving allegedly false recantations of a rape complaint by Shelly McClure (hereinafter the McClure indictment). The McClure indictment eventually was dismissed on the ground that the case was new matter which the special prosecutor should not have presented for the first time to that Grand Jury during its extended term (see, People v Williams, 73 NY2d 84). As set forth in the Court of Appeals' opinion for dismissal, the chain of events underlying the charges started with the criminal complaint accusing McClure's stepfather, Martin Williams, of rape (see, supra, at 86-87). Shortly before the complaint was to be submitted to a Grand Jury, Donna Williams (McClure's mother), Jeffrey Snyder (McClure's boyfriend) and attorney Michael Barrett (who represented Martin Williams) allegedly induced McClure to sign a sworn false recantation statement in return for the payment of a total of $3,000 to her and Snyder. Based upon the recantation statement, a warrant for Martin Williams' arrest was withdrawn. However, upon further investigation by the District Attorney, McClure and Snyder admitted receiving money for the false recantation. When Barrett then withdrew from representing McClure's stepfather on the rape charge, plaintiff, another attorney, was substituted as his counsel. Allegedly, plaintiff and Donna Williams pressured McClure into signing a second sworn false recantation statement.

The McClure indictment charged Donna Williams and Barrett with the crime of bribing a witness, a felony. McClure and Snyder were charged with the crime of bribe receiving by a witness, also a felony. The same defendants, with Martin Williams, were charged with misdemeanor conspiracies in connection with the foregoing felonies. McClure, Snyder, Barrett and Donna Williams were charged with the misdemeanor offense of making an apparently false sworn statement in the second degree, i.e., McClure's first recantation statement. The same defendants were charged with conspiracy to commit that crime. McClure, Donna Williams, Martin Williams and plaintiff were charged with making an apparently false sworn statement in the second degree in connection with the second McClure recantation statement, and with conspiracy to commit that crime. The dismissal of the McClure indictment was initially granted by County Court. The dismissal was reversed by this Court (People v Williams, 139 AD2d 138, revd 73 NY2d 84). The Court of Appeals granted leave to appeal and, upon

appeal, reversed and reinstated the dismissal *(People v Williams,* 73 NY2d 84, *supra).*

Because of the nature of the charges and particularly the involvement of two local attorneys, the proceedings on the McClure indictment received considerable notoriety and media coverage. Nine of the 10 causes of action set forth in plaintiff's complaint relate to articles or headlines in defendant's newspaper, the Troy Record, regarding developments or court appearances in those proceedings. The gravamen of plaintiff's claim with respect to each of those articles or headlines is that defendant expressly or impliedly falsely reported that plaintiff had been indicted on felony bribery charges, whereas in fact he had only been charged with the misdemeanors of making an apparently false sworn statement in the second degree and conspiracy to commit that crime. After some pretrial discovery had been had, defendant moved for summary judgment on the grounds, *inter alia,* that the articles were absolutely privileged under Civil Rights Law § 74 and that, even if the articles were false and defamatory, plaintiff could not establish the requisite degree of culpability on defendant's part for the imposition of liability because plaintiff was either a public figure or the articles involved a matter of public concern *(see, New York Times Co. v Sullivan,* 376 US 254, 280; *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199). Supreme Court denied defendant's motion as premature, holding that plaintiff was entitled to develop additional evidence through further discovery. This appeal by defendant followed.

■■■ We reverse the denial of defendant's summary judgment motion, concluding that all 10 of the causes of action set forth in the complaint should be dismissed as a matter of law. As to the articles and the headlines reporting on developments in the criminal prosecution of plaintiff and his five codefendants for the procurement of the McClure recantation statements, plaintiff's libel claims are barred by the absolute privilege set forth in Civil Rights Law § 74, as each of the complained-of pieces constituted either "a fair and true report of [a] judicial proceeding" or a "heading of [a] report which is a fair and true headnote of the statement published" *(id.).* The case law has established a liberal interpretation of the "fair and true report" standard of Civil Rights Law § 74 so as to provide broad protection to news accounts of judicial or other official proceedings. Thus, it has been held that "a fair and true report admits of some liberality; the exact words of every

proceeding need not be given if the substance be substantially stated" *(Briarcliff Lodge Hotel v Citizen-Sentinel Publs.,* 260 NY 106, 118). In the leading modern case on Civil Rights Law § 74, *Holy Spirit Assn. for Unification of World Christianity v New York Times Co.* (49 NY2d 63), the Court of Appeals stated that: "newspaper accounts of * * * official proceedings must be accorded some degree of liberality. When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author" *(supra,* at 68). In applying the statutory standard to press coverage of legal proceedings, it was stated that: "Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of * * * statutes like section 74 of the Civil Rights Law * * * Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression" *(Gurda v Orange County Publs. Div. of Ottaway Newspapers,* 81 AD2d 120, 133 [Mollen, P. J., and Titone, J., concurring in part and dissenting in part], *revd on concurring and dissenting opn below* 56 NY2d 705, 708).

The Courts' application of the foregoing principles to the facts in the two cases last cited above is instructive. The complaint in *Holy Spirit Assn. for Unification of World Christianity v New York Times Co. (supra)* related to articles in the New York Times on the connection between the plaintiff and the Korean Central Intelligence Agency. The factual statements in the articles were derived from three intelligence documents released by a congressional investigative committee, each of which was apparently based upon disclosures from the same informant. In the first of the intelligence documents, the source of the information was specifically labeled as "unevaluated". Thus, the New York Times acknowledged in its articles that the information in the first intelligence document was unverified. However, the Times reported that the information in that document was "confirmed and elaborated on" in the two subsequent documents, but failed to report that the "confirmatory" documents were actually from the same unverified source. The Court of Appeals held that, although

the terms used in the article may have connoted "a sense of legitimacy [to the reports] which, in hindsight, could be characterized as imprudent given the unverified nature of the reports, this observation does not, in and of itself, render the newspaper articles unfair" *(supra,* at 68), and upheld summary judgment dismissing the complaint.

In *Gurda v Orange County Publs. Div. of Ottaway Newspapers (supra),* the defendant's newspaper reported on a court's decision, following a bench trial, to upset the transfer of real property to the plaintiffs by the judgment debtor as a fraudulent conveyance under Debtor and Creditor Law § 276, and awarding counsel fees. The decision reported on by the defendant had ruled that the transfer was made with an " '[a]ctual intent to hinder or delay' " the judgment creditor in satisfying its judgment. The decision expressly disclaimed making a finding of an actual intent to defraud, noting that this was not necessary to satisfy the statutory requirements for setting aside the conveyance *(see, supra,* at 127-128). Yet the headlines and lead paragraph of the article in the defendant's newspaper on the case reported that the court had found that the plaintiffs " 'defrauded' " the judgment creditor and that the plaintiffs were " 'fined' in a 'fraud' case" *(supra,* at 128). The majority of the Appellate Division in *Gurda* held that a jury question was presented on whether the article was a fair and true report because the words used were susceptible to an interpretation charging criminal conduct and the article did not differentiate between civil and criminal fraud *(supra,* at 123-124). The dissenting and concurring Justices in *Gurda* (whose opinion was adopted by the Court of Appeals) held, however, that the article was entitled to the protection of Civil Rights Law § 74 as a matter of law. They reasoned that (1) the terms "fraud" and "fine" do not exclusively relate to criminal activity *(supra,* at 130), (2) in the context of the entire article the objectionable words did not support the libelous connotation attributed to them *(supra),* and (3) because the heading of Debtor and Creditor Law § 276 itself states "[c]onveyance made with intent to defraud" (albeit that under the section a less culpable intent is sufficient), a newspaper cannot be held to a stricter standard in "the correct use of technical and legal terms than is the Legislature which drafted the statutes themselves. Plainly, a newspaper must be afforded immunity under section 74 of the Civil Rights Law when it reports on judicial proceedings using the very language of the statutes at issue in those proceedings" *(supra,* at 132).

■ In our view, the articles and headlines plaintiff complains of fell well within the standard of a fair and full report under the holdings of the foregoing cases. The complaint cites to four headlines referring either to the "Bribery Case", "Bribery Case Defendants" or "Bribery Trial", after which the articles identified plaintiff as a defendant in the case. However, in each instance, the body of the article correctly stated that plaintiff was charged with conspiracy and making an apparently false sworn statement. Moreover, bribery offenses were the most serious crimes charged in the indictment and, counting the charges of conspiracy to bribe or to accept a bribe, comprised four of the eight counts of the indictment. Thus, considering the headlines in the context of the articles that followed, as we must, and the predominant nature of the case as a whole, each headline under review constituted a fair and true headnote of the article published and was, therefore, entitled to absolute immunity under Civil Rights Law § 74 *(see, Gurda v Orange County Publs. Div. of Ottaway Newspapers, supra; Paris v New York Times Co.,* 170 Misc 215, 218-219, *affd without opn* 259 App Div 1007).

■ We reach the same conclusion with respect to the articles that plaintiff claims to be libelous. Of the five articles cited in the complaint, the most objectionable are three which appeared in the December 31, 1987, July 19, 1988 and September 28, 1988 editions of defendant's newspaper, in which the indictment is mischaracterized as accusing "two Troy attorneys and four others * * * of bribing a reported rape victim", and other offenses. The presence of such a misstatement in an article does not necessarily mean, however, that there is a triable issue of fact as to whether the article was false and unfair. The article as a whole may nevertheless be substantially accurate so as to qualify as a fair and true report *(see, Holy Spirit Assn. for Unification of World Christianity v New York Times Co.,* 49 NY2d 63, 67-68, *supra; Briarcliff Lodge Hotel v Citizen-Sentinel Publs.,* 260 NY 106, *supra).* In each of the articles herein, at the point when plaintiff was specifically named as one of the defendants, the charges against him were accurately described and the defendants who were actually charged with the more serious bribery offenses were accurately and specifically identified. At most, therefore, the misstatements may have created some ambiguity in the mind of a reader, which would have been satisfactorily resolved for purposes of Civil Rights Law § 74 upon reading the full article where the charges against each named defendant, including

plaintiff, were accurately treated in detail *(see, Gurda v Orange County Publs. Div. of Ottaway Newspapers, supra,* at 129-130).

Moreover, the December 31, 1987 article reported on and followed within days of County Court's initial decision dismissing the indictment, and the July 19, 1988 article followed within days of and commented on the effect of this Court's decision reversing County Court's order of dismissal *(see, People v Williams,* 139 AD2d 138, *supra).* In both decisions, the opening paragraphs recited that the "defendants" were indicted for "various offenses including bribery", without distinguishing those defendants, including plaintiff, who were not charged with bribery offenses. Plainly, then, to paraphrase the holding in *Gurda v Orange County Publs. Div. of Ottaway Newspapers (supra),* "a newspaper must be afforded immunity under section 74 of the Civil Rights Law when it reports on judicial proceedings using the very language" of the court decisions upon which it was reporting *(see, supra,* at 132).

■ Finally, dismissal is also warranted with respect to plaintiff's 10th cause of action, regarding a November 10, 1987 article headlined "Attorney Hard to Find" and describing the difficulty the Rensselaer County Sheriff's Department was having in serving plaintiff with a summons regarding an unrelated lawsuit commenced against him. Plaintiff complains that, because the article was positioned next to another article concerning the McClure indictment, it suggested that plaintiff was secreting himself as a result of the criminal charges. Undeniably, however, the article itself is an accurate statement of the facts, i.e., that the Sheriff's office made two unsuccessful attempts to serve process on plaintiff. It seems self-evident that on those two occasions plaintiff indeed was "hard to find". The headline was, thus, a fair indicator of a true report and, as such, is not actionable *(see, Paris v New York Times Co.,* 170 Misc 215, *supra),* despite the speculative innuendo attributed to it by plaintiff because of the placement of the article *(see, Moran v Hearst Corp.,* 40 NY2d 1071, 1072).

YESAWICH JR., J. P., CREW III, MAHONEY and HARVEY, JJ., concur.

Ordered that the order is modified, on the law, with costs to defendant, by reversing so much thereof as denied defendant's motion; motion granted, summary judgment awarded to defendant and complaint dismissed; and, as so modified, affirmed.