Jonathon Keith IDEMA, and Counterr Group, Inc., Plaintiffs,

v.

Richard K. WAGER, et al., Defendants.

No. 99 CV 09382(CM).

United States District Court,
S.D. New York.

Nov. 2, 2000.

362

J. Keith Idema, Fayetteville, NC, pro se.

Thomas Sassone, Sassone, Zemanek, & Girasa, New City, NY, for plaintiff Counterr Group, Inc.

James E. Nelson, Van De Water & Van De Water, LLP, Poughkeepsie, NY, for defendants.

## MEMORANDUM DECISION AND ORDER DISMISSING COMPLAINT

McMAHON, District Judge.

*Background*

On January 29, 1999, an article with the headline, "Militant Sues Red Hook" was published by defendant Richard K. Wager ("Wager"), publisher of defendant *The Poughkeepsie Journal* (*"Journal"*). (Compl.¶¶ 5, 8, 16.) The *Journal* has a daily circulation of 45,000 throughout the counties of Dutchess, Ulster, Orange and Westchester. (Compl.¶ 8.) It is managed by defendant Stuart Shinske ("Shinske") and employs defendant and author of the article, Gabriel J. Wasserman ("Wasserman"). (Compl.¶¶ 6, 7.) Defendants Gannett Company, Inc. ("Company"), Gannett National Newspaper Sales, Inc. ("Sales"), and Gannett Satellite Information Network ("Network") are the owners of the paper. (Compl.¶¶ 8–11.)

At the time of publication, the plaintiffs, Jonathon Keith Idema ("Idema") and Counterr Group, Inc. ("Counterr"), a police and military training organization headed by Idema, had commenced a civil suit against the Town of Red Hook in the Supreme Court of Dutchess County in New York. (Compl.¶ 15.) Counterr was located in Red Hook until Idema moved to Fayetteville, North Carolina. (Compl.¶¶ 3, 4.)

On January 30, 1999, after reading the article, Idema faxed a letter to Wager. (Compl.¶ 31) He demanded a retraction and written apology to the plaintiffs for use of word "militant" to describe them. (Compl. ¶ 31.; *see also* Compl.Ex. B (letter from Idema to Wager of January 30, 1999).) He claimed that the defendants

wanted to associate them with members of the Communist party, or in the alternative, with individuals who advocate the overthrow of the United States government by force. (Compl. ¶ 25.)

On February 1, 1999, Wager's faxed response to Idema was: "After careful review of the facts, we believe our reporting has been fair." (Compl. ¶ 35; *see also* Compl.Ex. D (letter from Wager to Idema of Feb. 1, 1999).)

On February 5, 1999, Idema forwarded a certified mail letter to Wager. (Compl. ¶ 32; *see also* Compl.Ex. C (certified mail receipt).) Again, he requested a retraction and an apology for use of the word "militant" to describe him and his organization. (Compl. ¶ 33.) He also threatened to commence action for libel and defamation. (*Id.*) As the reader will surmise, whatever response he received from defendants was unsatisfactory, and he made good his threat.

The instant complaint purports to state claims under the First, Fifth, and Ninth Amendments to the United States Constitution and "the federal common law." (Compl. ¶ 13.) All of these claims are fatally deficient—the constitutional claims because the defendants are private entities, and the Constitution protects citizens only against intrusion by the Government; and the "federal common law" claim because, as Justice Cardozo declared long ago in the immortal case of *Erie v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "There is no federal common law." However, the complaint must be liberally construed, as this action was commenced by plaintiff pro se.[1] I therefore read the allegations of the complaint without any constitutional or federal gloss, as they would be understood under State law.

The first cause of action sounds in libel and defamation. (Compl. ¶¶ 15–37.) Plain-

tiffs allege that the defendants' use of word "militant" in its headline discredited plaintiffs' profession and professionalism, and exposed them to "hate, ridicule, and contempt." (Compl. ¶¶ 19, 20.)

In their second cause of action, plaintiffs allege civil conspiracy. (Compl. ¶¶ 38–55.) They contend that, for almost two decades, defendants have consistently and intentionally altered facts and stories involving plaintiffs for the sole purpose of discrediting, humiliating and defaming them. (Compl. ¶¶ 52–55.)

The third cause of action is based on a theory of intentional infliction of emotional distress. (Compl. ¶¶ 56–59.) Plaintiffs allege that they possess a "constitutionally protected right to be free from emotional distress intentionally inflicted upon them as a part of conspiracy to destroy their lives and business." (Compl. ¶ 58.)

The fourth cause of action is based on a violation of the plaintiffs' civil rights. (Compl. ¶¶ 60–64.) Plaintiffs allege that they have a "constitutionally protected right to their good name and reputation," and that defendants conspired to violate their civil rights. (Compl. ¶¶ 62–63.)

The plaintiffs pray that the defendants be held jointly and severally liable. (Compl. ¶¶ 1–9.) Plaintiffs demand $5,000,000 in damages plus $10,000,000 in punitive damages. (Compl. ¶¶ 67 – 71.)

On October 29, 1999, the defendants filed a Rule 12(b)(6) motion to dismiss. The motion was granted on default on December 14, 1999. That default was later vacated as to Idema, but Counterr was forced to retain counsel to defend. It did so (at least nominally), and filed a motion to vacate the default on February 4, 2000.

For the reasons stated below, defendants' motion to dismiss is granted, and

---

1. Plaintiff originally purported to represent himself and Counterr. When this Court defaulted Counterr for failing to appear by an attorney, as required, the corporation procured the services of one Thomas Sassone, who—despite his status as a member of the Bar of this Court—appears to have relied on plaintiff for the substantive work on both the pleading and the pending motions.

the motion to vacate the default by the corporate defendant is denied as moot.

*Discussion*

Under the Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint is appropriate only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing the sufficiency of a complaint, all well-pleaded allegations are treated as true and all inferences are drawn in favor of the pleader. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Nonetheless, a court will grant a Rule 12(b)(6) motions to dismiss in a libel action where plaintiffs cannot that the particular word or phrase in question are libelous and defamatory. *See Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir.1997) [hereinafter *Levin II* ]; *Levin v. McPhee,* 917 F.Supp. 230, 243 (S.D.N.Y. 1996) [hereinafter *Levin I* ], *aff'd* 119 F.3d 189 (2d Cir.1997); *Oliveira v. Frito–Lay, Inc.,* No. 96 Civ 9289, 1997 WL 324042, at *2 (S.D.N.Y. June 13, 1997); *Weinstein v. Friedman,* No. 94 Civ 6803, 1996 WL 137313, at *10, *11 (S.D.N.Y. March 26, 1996).

None of plaintiffs' claims can withstand even this deferential analysis.

A. *Libel and Defamation:*

■ Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander. *See Morrison v. Nat'l Broad. Co.,* 19 N.Y.2d 453, 458, 280 N.Y.S.2d 641, 644, 227 N.E.2d 572 (1967). The law of defamation serves to protect an individual's right to one's reputation. *See Gertz v. Welch,* 418 U.S. 323, 343–45, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). To establish a prima facie case of personal injury based on the publication of libel or slander, all of the following elements are required: 1) a false and defamatory statement of and concerning the plaintiff; 2) publication by defendant of such a statement to a third party; 3) fault on part of the defendant; and 4) injury to plaintiff. *See, e.g., Weinstein,* 1996 WL 137313, at *10; *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57 at 62–64 (2nd Cir.1993); *Church of Scientology Int'l v. Eli Lilly and Co.,* 778 F.Supp. 661 at 666 (S.D.N.Y.1991); *Policano v. North American Precis Syndicate, Inc.,* 129 A.D.2d 488, 514 N.Y.S.2d 239, 241 (1st Dept.1987); *Kuan Sing Enterprises, Inc. v. T.W. Wang Inc.,* 86 A.D.2d 549, 550, 446 N.Y.S.2d 76, 77 (1st Dept.1982).

■ Competing with the individual's right to protect one's reputation are the constitutionally guaranteed First Amendment freedoms of speech and press. *See, e.g., Gertz,* 418 U.S. at 341, 94 S.Ct. 2997; *Gurda v. Orange County Publications,* 81 A.D.2d 120, 131, 439 N.Y.S.2d 417, 423 (2nd Dept.1981) (Mollen, J., dissenting); *rev'd for reasons stated in this dissent, 124 Ill.App.3d 222, 79 Ill.Dec. 551, 463 N.E.2d 1326* (3rd Dist.1984). Constant punishment resulting from defamation suits might compel news media to guarantee its factual assertions. *See Gertz,* 418 U.S. at 340, 341, 94 S.Ct. 2997; *Gurda,* 81 A.D.2d at 131, 439 N.Y.S.2d 417 (Mollen, J., dissenting). This would stifle, not promote, "an active, thriving, and untrammeled press, [which is] an indispensable component of any free and democratic society." *Gurda,* 81 A.D.2d at 131, 439 N.Y.S.2d 417 (Mollen, J., dissenting). To avoid this socially undesirable result, New York has enacted section 74 of the New York Civil Rights Law as a broad protection on the press' right to report. *See N.Y.Civ.Rights Law* § 74 (McKinney 1963); *see, e.g., Beary v. West Publishing Co.,* 763 F.2d 66, 68 (2d Cir.1985) (citations omitted). Section 74 provides that:

A civil action cannot be maintained against any person, firm, or corporation, for the publication of a fair and true report of any judicial proceeding, or for any other heading of the report which is a fair and true headnote of the statement published.

N.Y.Civ.Rights Law § 74 (McKinney 1963). Thus, plaintiffs' claims cannot be countenanced by a court applying New York law if the use of the word "militant" in the "heading of the report" (i.e., the headline) is a "fair and true headnote of the statement published." *Id.* Whether a headline is a "fair and true headnote of the statement published," is a determination that the court must make. *See, e.g., Karp v. Hill and Knowlton, Inc.,* 631 F.Supp. 360, 363 (S.D.N.Y.1986).

■ First, however, this court needs to determine whether the use of the word "militant" in the headline is susceptible of being defamatory at all. The relevant inquiry focuses on whether the allegedly defamatory word or phrase constitute a fact or an opinion. In making this determination (which is, again, a question of law for the Court, *see Levin II,* 119 F.3d at 196), courts use a three-part inquiry: (1) whether the specific language used was precise and readily understood; (2) whether statements are susceptible of being proven false; and (3) whether context of statements signals to reader that what is being conveyed is likely to be opinion or fact. *See id.* at 196.

Plaintiff argues, citing *Flamm v. American Association of University Women,* 201 F.3d 144, 147 (2nd Cir.2000), (1) that Defendant's use of the word "militant" reasonably implies that Plaintiff engages in "revolutionary socialism" (Pl.'s Ex. E, Resp. To Defs.' 12(b)(6) Mot.), and (2) that the accusation "can be proven false." *Flamm* at 147. However, the libelous innuendo at issue in *Flamm* is too dissimilar to serve as a basis for this Plaintiff's challenge. In *Flamm,* Defendant American Association of University Women published a directory of attorneys which included a description of the attorney Flamm as " 'an ambulance chaser' with an interest only in 'slam-dunk cases.' " *Id.* The *Flamm* court found that these phrases "reasonably" implied that Flamm "engage[d] in the unethical solicitation of clients" and that the accusation could be

proven false. *Id.* The phrase "ambulance chaser" as applied to an attorney cannot be read without a negative inference, whereas the use of the word "militant" to describe this Plaintiff carries no clear inference at all. Therefore, where "ambulance chaser" conveys an obvious, negative message which satisfies the elements set forth in *Levin II,* 119 F.3d at 196, "militant" may not.

■ The word "militant" used in the headline of which plaintiff complains is not defamatory as a matter of law and will not support an action for defamation. The word itself has many meanings and shades of meaning, ranging from the religious ("the Church Militant" a term used to refer to Christians who are currently alive and, presumably, fighting the forces of evil in the name of Jesus), to the political ("Militant Civil Rights Activist" referring to those who fight with soldierly zeal to combat for the cause of equal rights). Susan B. Anthony, Martin Luther King, Jr., and Mother Teresa have each been called "militant" in the service of their respective causes, yet society regards them as noble, not nutty. Thus, contrary to plaintiffs' assertion, the word does not have a "precise and readily understood meaning" such that the reader would immediately perceive it to be derogatory. *See Levin II,* 119 F.3d at 196. Standing alone, the word carries no connotation whatever or Communism, extremism or belonging to what plaintiffs describe as "the fringe elements of society." Nor does it suggest any design to overthrow the Government. Indeed, the word is far less precise than the phrase "fellow traveler of fascism," which has been held not to have a precise and unambiguous meaning and not to be susceptible of being proven false. *See Buckley v. Littell,* 539 F.2d 882 at 894 (2nd Cir.1976). Therefore, the average reader would be more likely to conclude that the word was used as an opinion about plaintiff, rather than as a fact.

■ Under Section 74, the Court is required to put the word back in its alleg-

edly libelous context—what is referred to as a totality of circumstances test. *See* N.Y.Civ.Rights Law § 74 (McKinney 1963); *Gurda*, 81 A.D.2d at 131, 439 N.Y.S.2d 417 (Mollen, J., dissenting). Thus, to ascertain whether a headline is a "fair and true headnote of the statement published," the effect of the headline and the article on the ordinary reader must be examined together under a totality of circumstances. *See, e.g., Steinhilber v. Alphonse*, 68 N.Y.2d 283, 294, 508 N.Y.S.2d 901, 501 N.E.2d 550, 552 (1986). Circumstances that tend to establish the false and defamatory nature of a word or phrase include the "tone" of the reportage, *see Cole Fischer Rogow, Inc. v. Ally, Inc.*, 29 A.D.2d 423, 426, 288 N.Y.S.2d 556, 562 (1st Dept.1968), and the content of the headline and the article. *See Karp*, 631 F.Supp. at 365; *Mencher v. Chesley*, 297 N.Y. 94, 99, 75 N.E.2d 257, 259 (1947). The content of the headline and article are examined using the common usage or meaning of the specific language used in the challenged statement. *See Karp*, 631 F.Supp. at 365; *Mencher*, 297 N.Y. at 99, 75 N.E.2d 257. The challenged language should not be construed with the close precision expected from lawyers and judges, because the ordinary reader would not stop to analyze. *See, e.g., Weiner v. Doubleday and Co., Inc.*, 74 N.Y.2d 586, 592, 550 N.Y.S.2d 251, 549 N.E.2d 453, 455 (1989); *Mencher*, 297 N.Y. at 101, 75 N.E.2d 257; *Sweeney v. Prisoners' Legal Services*, 84 N.Y.2d 786, 622 N.Y.S.2d 896, 647 N.E.2d 101 (1995). Nonetheless, whether the common usage or meaning of the challenged language ascribed to it is capable of a defamatory meaning is to be determined by the courts. *See, e.g., Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 155 N.E.2d 853, 854 (1959). And in determining what is the common usage or meaning of challenged specific language, courts must not find defamatory interpretation where none exists or strain to interpret it in its mildest and most inoffensive sense. *See Weiner*, 74 N.Y.2d at 592, 550 N.Y.S.2d 251, 549 N.E.2d 453; *Mencher*, 297 N.Y. at 101, 75

N.E.2d 257; *Sweeney*, 84 N.Y.2d at 786, 622 N.Y.S.2d 896, 647 N.E.2d 101. Only where reasonable minds could disagree over the tone and content of an article and its headline must the claim go to the jury, "to determine in what sense the words were used and understood by the ordinary reader." *See, e.g., Weinstein*, 1996 WL 137313, at *10.

The instant complaint does not even present a close question, let alone one over which reasonable minds could differ. This is true whether plaintiffs' claim is analyzed as a *per se* or a *per quod* libel.

■ The challenged language is actionable *per se* if it tends to expose another to "public hatred, shame, obloquy, contempt, ridicule, aversion, ostracism, degradation, or disgrace" or "to induce an evil opinion of one in the minds of right-thinking persons and to deprive one of one's confidence and friendly intercourse in society" or tends to disparage a person in the way of his office, profession or trade. *See Tracy*, 5 N.Y.2d at 136, 182 N.Y.S.2d 1, 155 N.E.2d 853; *see, e.g., Kimmerle v. New York Evening Journal, Inc.*, 262 N.Y. 99, 186 N.E. 217, 218 (1933). It is not clear from the face of the headline that the word "militant" is used in any negative sense that would expose the plaintiff to "public shame, ridicule, or ostracism." *Gurda*, 81 A.D.2d at 131, 439 N.Y.S.2d 417 (Mollen, J., dissenting). And a reading of the article and the headline together does not suggest to a reasonable reader what it apparently suggests to an overly sensitive Idema: that "militant" defines only fringe, lunatic elements in society. *See id.* In fact, the article refers to the Plaintiff as the "operator of a former anti-terrorist training facility" which was once "featured by CBS as the most professional organization of its kind". (Gabriel Wasserman, "Militant Sues Red Hook", *Poughkeepsie J.*, Jan. 29, 1999, attached as Compl.Ex. A.) Therefore, because the word "militant" is not clearly libelous on its face, the headline is not actionable *per se*. *See Gurda*,

81 A.D.2d at 131, 439 N.Y.S.2d 417 (Mollen, J., dissenting).

When the common usage of the challenged language can be libelous due to extrinsic circumstances, plaintiff can bring an action for libel *per quod.* *See, e.g., Oliveira,* 1997 WL 324042, at *8; *Rogow,* 29 A.D.2d at 426, 288 N.Y.S.2d 556. To succeed on a *per quod* libel theory, a plaintiff would need to show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors. *See id.* Thus, a plaintiff must innuendo to sustain a claim of libel *per quod. See, e.g., Oliveira,* 1997 WL 324042, at *8; *Rogow,* 29 A.D.2d at 426, 288 N.Y.S.2d 556. Whether the allegedly libelous language is capable of the libelous meaning charged by innuendo is a matter of law for the courts to decide. *See id.* Courts have not hesitated to find insufficient innuendo when only a strained, unreasonable, unjustifiable innuendo of the headline would support the plaintiff's contention that the challenged language exposes her to "public shame, hatred, or ostracism." *Id.* at 563. Furthermore, the plain and obvious meaning of the challenged language cannot be altered or changed by innuendo. *See, e.g., Tracy,* 5 N.Y.2d at 136, 182 N.Y.S.2d 1, 155 N.E.2d 853. In *Tracy,* the Plaintiff sued a newspaper for reporting that he was the last person known to have had contact with an alleged sex offender who fled the area and failed to appear in court. *See id.* Plaintiff claimed the article contained libelous innuendo that he had aided in the escape. However, the court found that Plaintiff's interpretation added "an entirely new and independent thought that [found] no support in the article" and was not actionable. *Id.* at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853.

To adopt the plaintiff's interpretation of the word "militant" as referring to "revolutionary Socialism", (Pl.'s Ex. E, Resp. to Defs.' 12(b)(6) Mot.) would not explain any statement in the article, but would add "an entirely new and independent thought" that finds no support in the body of the article. *See Tracy,* 5 N.Y.2d at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853. Nothing in the language of the article, plain or implied meaning, would subject the plaintiff to contempt, aversion or affect him in his calling as a criminologist or police instructor. *See id.* Nothing in the story supports plaintiffs' reading of the word "militant" as advocating the overthrow of the Government or being on the lunatic fringe of society. The defamatory innuendo proposed by plaintiffs does not clarify any statements in the article, but instead injects new meaning into the story that the article does not support. Thus, because nothing in the article would subject them to hatred, contempt or aversion, the use of the word "militant" in the headline would not do so.

In addition, plaintiffs' claim fails under a libel *per quod* analysis because plaintiffs have failed to plead special damages. Special damages consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation by defamation; not from the effects of defamation." *Matherson v. Marchello,* 100 A.D.2d 233, 234, 473 N.Y.S.2d 998, 1001 (2nd Dept.1984). When the loss of business is claimed, persons who ceased to be customers must also be named and the losses itemized. *See id.* "Round figures" or a general allegation of a dollar amount as to special damages do not suffice. *See id.* It is well settled law in New York that special damages must be fully and accurately defined "with sufficient particularity to identify actual losses." *Id.* In all cases that are libel *per quod,* failure to plead special damages is a fatal defect. *See id.*

In the instant case, plaintiff has not pleaded special damages. Although he states generally how he has been affected by the defendants' headline and article, he fails to identify actual losses or name any individuals who have ceased to be his customers due to the defendants' headline and

article. *See Matherson,* 100 A.D.2d at 234, 473 N.Y.S.2d 998; (Compl.¶¶ 27–30). He also fails to specify the amount of actual damage he has suffered, relying instead on round figures, which is not appropriate. *See Matherson,* 100 A.D.2d at 234, 473 N.Y.S.2d 998; (Compl.¶¶ 67–71).[2]

██ Finally, for a report to be characterized as "fair and true" under section 74, it is enough that the substance of the article and headline is substantially accurate. *See Holy Spirit Ass'n v. New York Times Co.,* 49 N.Y.2d 63, 67–68, 424 N.Y.S:2d 165, 399 N.E.2d 1185 (1979). Section 74 does not require that a defendant report exact words or exact language. *See Karp,* 631 F.Supp. at 363. The challenged language of the headline and article of an official proceeding, such as a judicial proceeding, "should not be dissected and analyzed with a lexicographer's precision", *Becher v. Troy Publ'g Co., Inc.,* 183 A.D.2d 230, 234, 589 N.Y.S.2d 644, 646 (3rd Dept. 1992) (citations omitted), because a newspaper article and headline is a condensed report of events. *See id.* For example, in *Becher,* the content of the headlines considered in context of the articles that followed warranted a conclusion that each headline constituted a "fair and true headnote" of the article published and therefore entitled to absolute immunity under section 74. *See id.* at 237, 589 N.Y.S.2d 644. The Plaintiff in *Becher* was an attorney who claimed his role in a rape case had been misreported to imply that he had been indicted on felony bribery charges, when in fact he had been charged only with misdemeanors. *See id.* at 233, 589 N.Y.S.2d 644. The court found that the alleged inconsistencies would not support a cause of action because the Plaintiff was either a public figure or the articles involved a matter of public convern. *See id.* Narrow and confining application of libel laws would entirely defeat the purpose of section 74, which was to encourage dissemination of information regarding official proceedings to make the public more aware. *See id.* at 232, 589 N.Y.S.2d 644.

To the extent that I might find that while the word "militant" in the headline could be misleading to the reader, for the purposes of section 74, any ambiguities and questions would have been resolved by perusing the article. *See Becher,* 183 A.D.2d at 237, 589 N.Y.S.2d 644. The article concerned a local judicial proceeding, and it was substantially accurate. *See Holy Spirit Ass'n,* 49 N.Y.2d at 67–68, 424 N.Y.S.2d 165, 399 N.E.2d 1185. Additionally, though the word "militant" probably did not exist anywhere in the written records of the judicial proceedings, and is not a synonym for the sort of "paramilitary" operation that Idema runs, any ambiguities created by the headline would be resolved for the reader by perusing the article, which nowhere describes Idema as a Communist or as someone on the lunatic fringes of society who seeks to overthrow the Government. Therefore, this headline is a "fair and true" headnote of the article and is privileged under section 74. *Karp,* 631 F.Supp. at 364; *see also Becher,* 183 A.D.2d at 237, 589 N.Y.S.2d 644.

Because plaintiffs have failed to satisfy the first element needed to sustain a claim of libel under New York law, it is not necessary to analyze any of the other elements. The first cause of action is dismissed.

### B. *Civil Conspiracy*

Plaintiffs' second cause of action seeks recovery on a civil conspiracy theory. It, too, must be dismissed as a matter of law.

██ New York recognizes no independent cause of action for civil conspiracy and putting a "conspiracy" label cannot revive flawed defamation claims. For example, the *Alexander & Alexander v. Fritzen* court held that:

> The allegations of the first cause of action are not sufficient. It purports to

---

2. I do not believe that plaintiff intended his complaint to sound in libel per quod, but I include this analysis out of an abundance of caution and in deference to his pro se status.

allege a conspiracy but, as we long ago held, 'a mere conspiracy to commit a [tort] is never of itself a cause of action.' 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102, 102 (1986) (citation omitted). Additionally, in *Russo v. Advance Publications,* a defective libel action "may not be pleaded as prima facie tort or conspiracy". 33 A.D.2d 1025, 1025, 307 N.Y.S.2d 916, 917 (2d Dept.1970).

In the instant case, the plaintiffs have done nothing more than to repeat their defamation allegations throughout the text of the complaint. (Compl.¶¶ 15–66.) Furthermore, the plaintiffs have claimed that all the named and unnamed defendants "conspired" to publish the *Journal* article, which allegedly exposed them to ridicule and contempt in the "minds of the right thinking members of society." (Compl.¶¶ 42, 45–46.); *see also Tracy,* 5 N.Y.2d at 135, 182 N.Y.S.2d 1, 155 N.E.2d 853. Neither the cause of action nor the facts they allege to support it are valid under New York law, and, as with all claims in the plaintiffs' complaint, they allege nothing more than defamation. (Compl.¶¶ 15–66.)

## C. *Intentional Infliction of Emotional Distress*

The plaintiffs' third claim is one for intentional infliction of emotional distress, which they allege resulted from the false and defamatory headline of the defendants.

██ It is nearly impossible in New York for a plaintiff to state a viable claim for intentional infliction of emotional distress. As the New York Court of Appeals stated in *Howell v. New York Post:*

> [T]he 'requirements of the rule are rigorous, and difficult to satisfy.' ... Indeed, of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous ... 'Liability has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.'

81 N.Y.2d 115, 122, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (1993) (emphasis supplied) (citation omitted). In the instant case, the court cannot find that the defendants' conduct has been so extreme that "it goes beyond all possible bounds of decency." *Id.* A possible error of word choice on the part of the defendants neither constitutes behavior that "goes beyond all possible bounds of decency" nor should be regarded as "atrocious and utterly intolerable in a civilized community." *Id.* Therefore, plaintiff has failed to state a viable claim for intentional infliction of emotional distress.

██ Furthermore, New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a claim for libel. *See, e.g., Durepo v. Flower City Television Corp.,* 147 A.D.2d 934, 537 N.Y.S.2d 391 (4th Dept.1989); *Sweeney v. Prisoners' Legal Services of New York,* 146 A.D.2d 1, 7, 538 N.Y.S.2d 370, 374 (3rd Dept.1989); *Manno v. Hembrooke,* 120 A.D.2d 818, 501 N.Y.S.2d 933 (3rd Dept. 1986). For example, in *Sweeney,* a cause of action for intentional infliction of emotional distress should not be entertained "where the conduct complained of falls well within the ambit of other traditional tort liability." 146 A.D.2d at 7, 538 N.Y.S.2d 370. In the instant case, the facts underlying plaintiffs' third cause of action "fall[ ] well within the ambit of other traditional tort liability." *Id.* Thus, the intentional infliction claim is duplicative of a traditional tort claim and must be dismissed. It makes no difference that plaintiffs' libel claim is insufficient. *See Levin I,* 917 F.Supp. 230; *see also Komarov v. Advance Magazine Publishers, Inc.,* 180 Misc.2d 658, 691 N.Y.S.2d 298 (1999) (dismissing as duplicative an intentional inflic-

tion of emotional distress claim against magazine article where libel claim also dismissed due to section 74 privilege).

### D. *Violation of Civil Rights*

Plaintiffs' final cause of action pleads an alleged deprivation of their civil rights, specifically "their constitutionally protected right to be free from libel, defamation, and emotional distress" and their "constitutionally protected right to their good name and reputation." (Compl. ¶¶ 61, 62.) Unfortunately, plaintiffs misapprehend the protections afforded by the Constitution and enforced by the civil rights law.

■ Actions by journalists in publishing a newspaper article do not constitute the requisite "state action" to support state action claims. *See, e.g., Rielly v. Barkley,* 1992 WL 390282 (E.D.N.Y.1992); *Skinner v. Dwyer,* 1992 WL 265995 at *2 (N.D.N.Y.1992) ("section 1983 may not be used when it is alleged that a purely private defendant has deprived someone of a constitutional right. ... A newspaper does not act under color of law when it publishes information received from police or other state officials."); *Fitzpatrick v. Wert,* 432 F.Supp. 601, 603 (W.D.N.Y.1977) (journalists "cannot be held liable under 42 U.S.C. §§ 1983 or 1985 for doing that which is their constitutionally protected right as newsmen").

■ Additionally, regardless of whom a plaintiff chooses to sue, section 1983 does not address an alleged injury to reputation. *Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). For example, in *Davis,* an alleged defamation was held not to injure a property or liberty interested protected by the U.S. Constitution, because reputation is not a constitutional right, liberty or interest. *Id.; see also Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Oltarzewski v. Ruggiero,* 830 F.2d 136 (9th Cir.1987); *Duff v. Sherlock,* 432 F.Supp. 423 (E.D.Pa.1977); *Tsermengas v. Pontiac Press,* 199 F.Supp. 557 (E.D.Mich. 1961).

There has been no actionable violation of the plaintiffs' civil rights in this case. *See, e.g., Rielly,* 1992 WL 390282; *Skinner,* 1992 WL 265995. The *Journal* and its employees are not "state actors," are not alleged to have engaged in "state action," and in no way acted "under the color of law." *Levy,* 47 F.Supp.2d at 491–92; *see also Gibbs–Alfano,* 47 F.Supp.2d at 512. Thus, the complaint is devoid of any facts that would render defendants amenable to suit for an alleged civil rights violation under 42 U.S.C § 1983. *See, e.g., Levy,* 47 F.Supp.2d at 491–92; *Gibbs–Alfano,* 47 F.Supp.2d at 512.

### 5. Counterr's Motion to Vacate the Default Judgment Is Denied

■ Defendant Counterr is not technically a party to the motion to dismiss, because judgment has already been entered dismissing its complaint on default. It has moved to vacate the default. Under Fed.R.Civ.P 60, such a motion is to be granted if at all possible. However, in order to make a successful motion to vacate a default judgment, the defaulting party must demonstrate that it has a valid claim or defense. Here, Counterr has none. It has explicitly adopted and relied on Idema's arguments in opposition to the motion to dismiss. All of those arguments were unsuccessful. The complaint cannot be resurrected as to the corporate defendant.

### Conclusion

The complaint is dismissed as against all defendants, with prejudice and with costs on the motion, assess against plaintiff Idema. Counterr's motion to vacate the default judgment is denied.